**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| **LARRY WELLS; DONNA WELLS;** *and* **CONNIE FARMER,** *individually and as personal representative of Charles Farmer* | **PLAINTIFFS** |
| V. | **CAUSE NO. 3:12-CV-564-CWR-FKB** |
| **ROBINSON HELICOPTER CO., INC.** | **DEFENDANT** |

*consolidated with*

| | |
|---|---|
| **WEBB GROUP, L.P.** | **PLAINTIFF** |
| V. | **CAUSE NO. 3:12-CV-613-CWR-FKB** |
| **ROBINSON HELICOPTER CO., INC.** | **DEFENDANT** |

**ORDER**

Before the Court are five motions to exclude filed by Larry Wells, Donna Wells, and Connie Farmer (together, the "Wells plaintiffs"). Docket Nos. 121, 127, 130, 133, 134. Webb Group, L.P. joins in the motions, while Robinson Helicopter Company opposes them.

**I.     Factual and Procedural History**

On September 1, 2009, Federal Aviation Administration inspectors Larry Wells and Charles Farmer were practicing helicopter landings and takeoffs in Jackson, Mississippi. They did so in their official capacities: the FAA had rented the helicopter for the day from Webb Group, L.P. The helicopter was a Robinson Helicopter Company R-44 "Raven I" bearing registration number N33PX.

While in the air, the helicopter began to vibrate. It crashed. Wells suffered severe injuries, while Farmer died.

In August 2012, the Wells plaintiffs brought this suit claiming that Robinson was liable to them for manufacturing a defective product which caused serious injuries or death. They alleged that the crash was caused by a known defect called "mast rocking" or "chugging," and asserted negligence, strict liability, failure-to-warn, and warranty theories of recovery.

That same month, Webb Group filed a lawsuit against Robinson seeking to recover its economic losses, such as lost business opportunities. Webb Group asserted similar theories of liability as the Wells plaintiffs. The cases were consolidated for discovery and trial.

The plaintiffs now seek to exclude five of Robinson's six designated experts: C. Thomas Webster, Kenneth Orloff, Timothy Tucker, Peter Riedl, and Douglas Tompkins. Each motion will be taken in turn.

## II.     Legal Standard

The admissibility of expert testimony is governed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the post-*Daubert* amendments to Federal Rule of Evidence 702. *See Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). That Rule now states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>     (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>     (b) the testimony is based on sufficient facts or data;
>     (c) the testimony is the product of reliable principles and methods; and
>     (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The purpose of the Rule is to guide the district court's gatekeeping function and ensure that the jury hears reliable and relevant expert testimony. *See Guy*, 394 F.3d at 325. "Reliability

is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid. Relevance depends upon whether that reasoning or methodology properly can be applied to the facts in issue." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quotation marks, citations, and brackets omitted); *see United States v. Fields*, 483 F.3d 313, 342 (5th Cir. 2007).

In *Daubert*, the Supreme Court described several non-exclusive factors that trial judges should use to gauge reliability, including whether the proposed technique or theory can be or has been tested, whether it has been subjected to peer review and publication, its error rate, and whether it is generally accepted in the scientific community. *See Guy*, 394 F.3d at 325; *Knight*, 482 F.3d at 351. The Fifth Circuit later clarified that "the reliability analysis must remain flexible: not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy*, 394 F.3d at 325 (citation omitted); *see Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007). The party offering the expert bears the burden of establishing reliability by a preponderance of the evidence. *Moore v. Ashland Chem. Inc*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

The *Daubert* analysis applies to the process of the expert's conclusions, not the merits of the conclusions themselves. *Guy*, 394 F.3d at 325. The merits remain subject to attack at trial under traditional principles of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. "[I]n determining the admissibility of expert testimony, the district court should approach its task with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quotation marks and citation omitted).

The Fifth Circuit has quoted with approval the Seventh Circuit's observation that "[u]nder the regime of *Daubert* a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Moore*, 151 F.3d at 278 (quotation marks and citation omitted). The extrapolation or "leap[] from an accepted scientific premise to an unsupported one . . . must be reasonable and scientifically valid." *Id.* at 279 (citations omitted).

## III.     Discussion

The Court begins with the plaintiffs' general objections. One is that several of Robinson's experts have not performed adequate testing. But an expert's role or lack thereof in testing a defective product (or its proposed remedy, etc.) typically goes toward weight. *E.g.*, *Hankins v. Ford Motor Co.*, No. 3:08-CV-639-CWR-FKB, 2011 WL 6046304, at *4 (S.D. Miss. Dec. 5, 2011). This alone is not enough to exclude any of the five experts in question.

The same is true of the plaintiffs' repeated objection to Robinson calling its employees as expert witnesses. Four of the five experts discussed below are Robinson employees. The plaintiffs argue that their testimony is unreliable because of their employment. The Court believes that this is a bias argument reserved for the jury's consideration. *E.g.*, *In re Plant Insulation Co.*, 544 F. App'x 669, 671 (9th Cir. 2013) (permitting expert testimony despite appellant's "alleg[ation] that the experts . . . have a direct financial stake in the outcome of the case because of their relationships with the debtor and the Creditors' Committee," since "evidence of bias goes toward the credibility of a witness, not his competency to testify"); *Livermore v. Arnold*, No. 10-507-JJB, 2013 WL 3786371, at *1 (M.D. La. July 18, 2013).

### A. C. Thomas Webster

C. Thomas Webster is a Robinson employee of 25 years. Docket No. 146-1, at 10. Over that time he has risen from helicopter mechanic to accident investigator. *Id.* Webster served as Robinson's "participating investigator," or corporate representative, to the National Transportation Safety Board's investigation of this crash. *Id.* at 1. His expert report presents information about mast rocking and Robinson helicopters to explain why he believes the crash was not caused by mast rocking. *Id.*

The plaintiffs argue that Webster is unqualified to give an opinion on causation and that his testimony is unreliable. The Court largely agrees.

"A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (citation omitted).

Webster is not an accident reconstructionist, metallurgist, or engineer. Docket No. 112-1, at 3. He has some experience but admittedly no expertise in piloting helicopters, material failure and fatigue analysis, engineering, and a number of other topics that came up during his deposition. *Id.* at 3, 7, 8, 11. Webster has never investigated an accident caused by mast rocking. *Id.* at 13. His causation opinions must be excluded.

In other circumstances, Webster may be able to testify as an expert on helicopter repair, inspections, or even, perhaps, the duties of corporate representatives in NTSB investigations. Here, though, Webster does not have sufficient "scientific, technical, or other specialized knowledge" to give the opinion he has given in this case. Fed. R. Evid. 702.

Webster's proposed expert testimony also is not "the product of reliable principles and methods." *Id.* His conclusions on mast rocking are based on personal conversations with pilots

and engineers who have experienced and studied the phenomenon. Docket No. 112-1, at 15-17. But he has no notes of his interviews, no records, and no names of his sources, save one test pilot who also works for Robinson. *Id.* He has attempted to aggregate others' feedback without any methodology for doing so. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 155 (1999) (affirming district court's exclusion of expert testimony as unreliable).

Webster's opinions are also derivative of others' work in a way that cannot be tested or examined. Here's one relevant exchange:

> Q: Do you consider yourself an expert in being able to differentiate between vibrations that are caused by low rotor RPM versus the vibrations that are caused by mast rocking, other than what you've heard from pilots? [Objection omitted.]
> A: I believe my knowledge about it and my research in it would allow me to make an expert opinion on that, yes.
> Q: Even though you have never experienced it yourself; correct?
> A: Correct.
> Q: And even though you've never done testing on that area yourself to be able to make these differentiations?
> A: Correct.
> Q: And you've seen no engineering data that makes these differentiations, have you?
> A: I've seen reports and I've talked to the people who have done those testing and collected that data.
> Q: What data?
> A: *Not that I've actually read the data*, but I have talked to the people that performed the tests.
> . . .
> Q: So I want to know, have you relied on any data in your rendition of what vibrations are expected with low rotor RPM versus mast rocking?
> A: *When you say "data," I'm not relying on written data but personal data that I've gathered from the people who have done the tests.*
> Q: So for this differentiation that we see here on page 7, you're relying solely on what you heard other pilots tell you?
> A: Not just pilots, but engineers.

Docket No. 112-1, at 16 (emphasis added).[1]

---

[1] At other times, Webster avoids questions which probe the depths of his expertise. Here is one relevant exchange:
> Q: Can you tell us as an expert that [mast rocking] cannot occur in straight and level flight?
> A: I can tell you I have no knowledge of it happening in straight and level flight.

6

To the extent the line of questioning concerned engineering data or testing on mast rocking, Webster should have personally read that data in arriving at his opinions. Simply adopting others' interpretations as one's own is not a reliable method of understanding anything. Perhaps more damaging is Webster's clarification that his "data" was not engineering data but rather his own summary of verbal reports. Again, he has articulated no standard for conducting such qualitative research, either with respect to gathering information or analyzing the results of his interviews. In short, he has no method and no one can test the truth of his results. The Rules of Evidence require more. *See, e.g.*, *Daubert*, 509 U.S. at 589 ("The adjective 'scientific' implies a grounding in the methods and procedures of science.").[2]

Robinson argues that Webster is qualified, that his testimony is admissible under Federal Rule of Evidence 703, that Webster can use hearsay just as other experts do, that he "has recently been accepted to provide both factual and expert testimony by a Federal District Court in an independent action involving the design and manufacture of the Robinson R44 helicopter," and that the plaintiffs' arguments lack merit because at one point in the deposition plaintiffs' counsel responds to Webster's answer by saying, "[t]hat's very good. All right." Docket No. 147. The arguments fail to persuade.

Robinson did not cite the case in which Webster was accepted as an expert, so we cannot compare it to our case or see whether his testimony was challenged.[3] And for its part, plaintiffs'

---

[2] These excerpts are not taken out of context. On redirect, Webster confirms that his knowledge of post-production mast rocking tests – which he opines are adequate to prevent mast rocking – is drawn from "the experts that have actually researched it . . . engineers or flight test pilots." Docket No. 112-1, at 20. The Court believes that the jury would be assisted by hearing from those engineers and pilots rather than their aggregator.

[3] A PACER search of the case listed in Webster's resume did not return any results. Moreover, the fact that a court anoints an expert witness in the area of "design and manufacture" of a helicopter does not lead inescapably to the conclusion that he should be an expert in every "design and manufacture" claim. Helicopters, like any other device, come with many parts, the failure of which could subject the manufacturer to a claim that the object is defective. In other words, different expertise would be needed depending on the issue to be placed before the jury. In the *Hankins* case cited previously, one of the issues concerned whether the sunroof of a Ford motor vehicle was designed defectively which made the vehicle itself dangerous. 2011 WL 6046304, at *1-2. In another "design and

counsel's remark is ambiguous. Counsel could have been conceding the correctness of Webster's testimony (which at that moment was on the center of gravity limit), indicating pleasure at Webster's performance that day, or simply bringing that line of questioning to a close.

More difficult is the question of hearsay. An expert opinion which relies upon hearsay may be admitted "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject," as long as the probative value of the hearsay outweighs its prejudicial effect. Fed. R. Evid. 703. "Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Kumho Tire*, 526 U.S. at 148 (quotation marks and citation omitted). Application of the Rule appears to be highly fact-specific. *See Guy*, 394 F.3d at 329 (affirming exclusion of expert's hearsay response); *United States v. Avants*, 367 F.3d 433, 447 (5th Cir. 2004) (affirming admission of expert's hearsay response where expert's response fell "within the parameters of his expertise").

The Court accepts that experts in the aviation industry do and should listen to the concerns of pilots and engineers. That is a common sense safety measure. Despite this conclusion, the undersigned believes that an expert in a particular field must demonstrate some reliable basis to speak on the subject at hand independent of other persons' out-of-court statements. As another Judge in this district has written, "[m]erely parroting the opinions of others stretches the boundaries of Rule 703 of the Federal Rules of Evidence." *Harris v. United*

---

manufacture" case against Ford, the issue concerned whether a bolt in the vehicle's suspension system fractured prior to a crash. *Wallace v. Ford*, No. 3:11-CV-567, 2013 WL 3288455 (S.D. Miss. June 28, 2013). Obviously, although *Wallace* and *Hankins* involved "design and manufacture" claims against Ford, different types of expert testimony was needed in each case. Here, the fact that Robinson says Webster was accepted as an expert involving the design and manufacture of the R-44 helicopter is not helpful. We know nothing about what that testimony was. It could have been related to the mounts, the rotary blades, or the configuration of any of the helicopter's many parts.

*States*, No. 3:10-CV-502-DPJ-FKB, Docket No. 111, at 9 (S.D. Miss. Apr. 2, 2013). Rule 703 does not save Webster's proposed expert testimony.

Finally, even if Webster was accepted as an expert, the Court would more likely than not exclude the expert portion of his testimony because it is cumulative of Robinson's other experts. As will be discussed below, Robinson may call the remaining experts it designated, subject to their testimony avoiding redundancy. The topics they are anticipated to address should cover Webster's thoughts on causation and R-44 helicopters.

For these reasons, C. Thomas Webster's proposed expert testimony will be excluded. He may testify as a fact witness subject to this Court's evidentiary rulings. *See* Docket No. 202 (Order granting motion to strike NTSB probable cause report).

**B.    Kenneth Orloff**

Dr. Kenneth Orloff has a Ph.D. in mechanical engineering and years of experience in aerospace engineering. Docket No. 128-1. He has been designated as Robinson's accident reconstructionist. Docket No.158. Dr. Orloff's primary opinion is that the crash could not have been caused by mast rocking because Robinson sufficiently flight-tested N33PX before it was delivered to Webb Group and found it "free of any such tendency." Docket No. 157-1, at 5.

The plaintiffs first contend that Dr. Orloff's testimony is "inherently unreliable" because he testified *for* plaintiffs and against Robinson in an earlier mast rocking case. Robinson says there is no conflict, in part because the cases are distinguishable and in part because it later implemented a new, more aggressive flight testing protocol which eliminated the danger to Wells and Farmer. The plaintiffs respond that the new opinion is baseless – based on money, not merit – because Dr. Orloff never tested or evaluated the efficacy of Robinson's new flight tests.

The Court finds this to be a credibility issue suitable for cross-examination. *See Daubert*, 509 U.S. at 596. The jury will decide whether it believes Dr. Orloff's explanation.

The same is true of the plaintiffs' next critique: that Dr. Orloff's opinion ignores eyewitness testimony of the crash. That also will be left for trial.

The plaintiffs then argue that Robinson and Dr. Orloff have failed to explain the methodology he used in forming his opinions. When asked about this during his deposition, Dr. Orloff said he used "[t]he same methodology I have been using for almost 33 years, and that's to consider all of the information available, to apply my experience, my background, my education in order to fill the gaps between what we know and what we don't know." Docket No. 128-1, at 12. When asked if this protocol was "accepted in your field," and if so, by whom, he responded, "[o]f course. . . . By most everyone that I know. That's the role of the expert." *Id.*

While this deposition answer alone may not pass muster in this circuit, *see Moore*, 151 F.3d at 276, Dr. Orloff's report and other portions of his deposition testimony confirm that his proposed opinion is adequately supported by the scientific method. *See, e.g.*, Docket Nos. 128-1, at 21 (deposition); 157-1 (report). This motion to exclude is denied.

### C. Timothy Tucker

Timothy Tucker, a Robinson employee of 32 years, is Chief Instructor of Robinson's safety course. Docket No. 132-1, at 47. He has over 19,000 hours of experience piloting helicopters. *Id.* Tucker opines that "[t]his accident was caused by a low RPM (revolutions per minute) rotor stall." *Id.* at 40.

While conceding Tucker's qualifications to speak as an expert pilot and trainer, the plaintiffs contend that Tucker may not express an ultimate opinion on causation because he "admitted no formal education or background in engineering, accident reconstruction,

10

metallurgy, engineering aspects of helicopter design, and any design systems engineering of the R44." Docket No. 132, at 2; *see Graves ex rel. W.A.G. v. Toyota Motor Corp.*, No. 2:09-CV-169-KS-MTP, 2011 WL 4590772, at *7 (S.D. Miss. Sept. 30, 2011) (excluding law enforcement officials who were not "qualified by education, training or experience to render opinions on causation based on the evidence they observed at the scene of this accident"). Robinson responds that Tucker's opinions "are clearly based on his extensive experience with the R44 helicopter, including both low main rotor RPM testing, analysis, causation, and recovery techniques, as well as his first-hand knowledge of mast rocking." Docket No. 151, at 7.

The Court has considered whether Tucker's opinion on causation can be admitted in full or instead whether he his experiences give him the ability to state only that the subject crash was "consistent with" a low RPM rotor stall. The latter option would reserve the ultimate opinion on causation to an accident reconstructionist. On balance, the Court finds that Tucker's significant experience outweighs any deficiency in his formal education or training on accident reconstruction. Tucker may testify in full.

The plaintiffs also argue that Tucker should be excluded because he does not know how soft or hard N33PX's mounts were, or the status of its low RPM light bulb. This credibility question will be reserved for the jury.

### D.    Peter Riedl

Peter Riedl has been Robinson's vice president of engineering for the last 16 years. Docket No. 136-1, at 3. He designed the R-44 helicopter. His opinion is that this accident was caused by low rotor RPM, not mast rocking. *Id.* at 1.

11

The plaintiffs contend that Riedl's supplemental expert report, which shares the results of flight testing conducted during this litigation, is untimely and should be excluded; that he is unqualified to testify to causation; and that he disregards established facts. Docket No. 136.

Considering that Riedl's supplemental report was approximately one month late, that the testing information it contains would assist the jury, and that the prejudice (if any) to the plaintiffs has been slight given the more than one-year delay between the supplemental report and the trial date in this case, the supplemental report will not be excluded. *See Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 883 (5th Cir. 2004).

On the merits, and with one caveat, Riedl may testify as an expert. He has studied mast rocking for years and the jury would benefit from his significant insight into the design of the helicopter. For the reasons stated above, the plaintiffs' arguments will go to weight.

The caveat is that Robinson will have to use judgment to avoid cumulative expert testimony. If it has already elicited causation opinions from Dr. Orloff and Tucker, it is difficult to see how Riedl may be a third expert to speak on the same subject. *See Leefe v. Air Logistics, Inc.*, 876 F.2d 409, 410 (5th Cir. 1989) ("It is within the power of the district court to exclude testimony that is repetitious and cumulative of testimony already before the court."). Riedl may have personal, factual knowledge regarding mast rocking which would not be cumulative, of course, but the jury does not need to hear the same expert opinion over and over again.

The course of the plaintiffs' anticipated expert testimony is unknown at this point because no *Daubert* motions were filed against them, but it goes without saying that they will be held to the same standard.

### E.     Douglas Tompkins

Since 1991, Douglas Tompkins has been Robinson's Chief Pilot. Docket No. 135-1, at 5. Like Tucker, he has more than 19,000 hours of experience piloting helicopters. *Id.* He opines that (1) the accident was not caused by the weather, (2) the accident was caused by low rotor RPM, (3) the accident was not caused by mast rocking, and (4) Wells was not a highly qualified helicopter pilot, contrary to what the plaintiffs' expert says. *Id.* at 1-4.

The plaintiffs seek to exclude Tompkins' second and third opinions for the reasons already summarized in their motion challenging Tucker's proposed expert testimony. The motion will be denied for the same reasons.

Although Tompkins may testify, he is subject to the same limitations on redundant and cumulative testimony already described. That is, Tompkins may present his first and fourth opinions with ease, but may not present opinions two and three if they have already been covered by Robinson multiple times.

## IV.    Conclusion

The motion to exclude Webster is granted. The remaining motions are denied.

**SO ORDERED**, this the 27th day of March, 2015.

s/ Carlton W. Reeves<br>
UNITED STATES DISTRICT JUDGE